Good afternoon, Your Honors. May it please the Court, my name is Peter Nordberg. I am one of four counsel for plaintiffs from whom you'll be hearing today. You'll also be hearing from my colleagues Roy Haber and David Breskin and Dan Johnson. And pursuant to the Court's order, we did confer before we came here today, and the division of labor we worked out is roughly as follows. I'm going to start off for 10 or 15 minutes talking about the Durfee Medical Monitoring Appeal, and also about the substantial factor test for causation that's been briefed in connection with the Buckner-Carlyle-Goldblum appeals. I'm going to hand off to Mr. Haber at that point, who is going to discuss some discrete evidentiary issues from the Buckner-Carlyle-Goldblum appeal. And Mr. Haber, after 10 or 15 minutes, is going to hand off to Messrs. Breskin and Johnson, who, between them, will talk for about 10 minutes about the appeal of Plaintiff Rhodes. That's the plaintiff whose claims were retried in the second trial. And then we will sit down. Defendants will have their say, and we will stand up to respond. And we can either do rebuttal, I don't know whether you want it at the very end of our presentation, immediately after defendants, or whether you prefer to leave that to us. But we'll accommodate the Court's wishes, whatever those may be. I'd like to start, then, with the Durfee appeal. This is the medical monitoring appeal. And I think Plaintiff's position on this is fairly straightforward. We have been accused, in the briefing, of trying to unravel this Court's ruling in Berg. The medical monitoring claims were not claims for bodily injury, sickness, disease, or death, within the meaning of 42 U.S.C. Section 2014Q, that they, therefore, did not arise from a nuclear incident, and that they, therefore, were not Price-Anderson claims. But, in fact, it's that ruling in Berg that formed the predicate for Plaintiff's motion to remand, in this case. The Durfee case that will be remembered was originally filed in Washington State Court. Defendants removed it, asserting jurisdiction under the Price-Anderson Act. And prior to the holding in Berg, I will tell you how Plaintiffs had been interpreting the Court's ruling in Durfee 1. That ruling was on review of an order dismissing the claims and denying a motion to remand. Defendants, having had the burden, as the party invoking federal jurisdiction, of establishing some predicate for subject matter jurisdiction in the district court, presumably carried that burden at some point. And the only way they could carry it would be if the claims arose from nuclear incidents under the Act, because otherwise subject matter jurisdiction, as I think everyone agrees, is absent. So, in Durfee 1, the Court decided two things. It decided that it did not need to reach the motion to remand, because the Court said that it had jurisdiction over the claims, that the district court had jurisdiction over the claims. And it also decided that CERCLA did not bar the claims or strip the Court of jurisdiction over them. That, in any case, is how Plaintiffs had been interpreting Durfee 1 before the ruling in Berg was issued. If that interpretation is correct, then the claims are cognizable under Price-Anderson, because they do arise from bodily injury, sickness, disease, or death within the meaning of 2014Q, do constitute claims arising from a nuclear incident within the meaning of that section, and section 22N2, in which event that language can't preempt the claims, as the Court had on defendant's interpretation suggested in Berg. Plaintiffs' interpretation of Durfee 1 may be incorrect. This Court in Berg, remember, ruled that the Court in Durfee 1 never reached the issue of affirmative jurisdiction under Price-Anderson, and ruled only that CERCLA did not strip the district court of any jurisdiction it would otherwise have. And that was the way this Court in Berg reconciled the two decisions. And if that interpretation of Berg is correct, then, well, that's the predicate for our motion to remand. Defendants in their briefing talk about the many meanings that the word jurisdiction can have, but one thing is clear. For the district court to have issued any ruling on the merits in this medical monitoring appeal, it had to have subject matter jurisdiction somehow. The only asserted basis for federal subject matter jurisdiction is the Price-Anderson Act. Under the Price-Anderson Act, it can have jurisdiction only if the claims do arise from a nuclear incident. That can be so under the definitions in the statute, in Section 2014Q, only if the claims do constitute bodily injury, sickness, disease, or death. Since this Court ruled in Berg that they don't, it follows that they don't arise from a nuclear incident, and any predicate for district court subject matter jurisdiction was lacking. Any predicate for subject matter jurisdiction being lacking, the district court should then have remanded the claims without taking further actions on the merits under Section 1447C, the removal and remand statute. Well, I may have to plead guilty in using some language in Berg that was less than perhaps crystal clear in speaking of subject matter jurisdiction, but as when perhaps it might have been phrased better as stating a claim. But as I understand what the district court did here, and I may be wrong, and that's what we're reviewing here, the district court said that following Berg that under Price-Anderson there must be actual physical injury, that there wasn't any, and then the question was whether there was any other cause of action under state law, and it said no. This is the exclusive cause of action, and that was it. Now, what was wrong with that? What was wrong with what the district court did here? That's what we're reviewing now. There was no 12B6 motion before the Court. There was no motion to dismiss the claims for failure to state a claim before the Court. So we think that on these two different interpretations of reality that our interpretation of Durfee or Berg did one of two things wrong. It either should have entertained the claims, because they're not. What claims? Is it a Federal claim or a state law claim? It's a state law claim. It's a claim arising under state law. Now, I'm aware that the panel said in the Berg opinion that it had no reason to believe that Congress would reach a contrary conclusion from the one reached by a court in the Western District of Washington interpreting Washington law. But the fact is that the Washington Supreme Court has not ruled one way or the other on medical monitoring claims, so that Western District of Washington decision is persuasive authority at most. And so what the district court had before it was reconsideration of a motion to remand. And although I understand that the Court may have had in mind some mechanism where it would, where Price-Anderson would permit the Federal courts to assume jurisdiction of these claims only then to dismiss them, with respect, we don't think the language of the statute supports that, because the same language that would define the scope of any preemption, the nuclear incident language, also defines the scope of subject matter jurisdiction. So that language has to be interpreted one way or the other. If it's interpreted to include medical monitoring, then seemingly those claims are not preempted. If it's interpreted not to include medical monitoring, then seemingly there's no subject matter jurisdiction, and defendant's preemption arguments would need to be addressed to the proper tribunal, which would be the state court on remand. That's a bit of a pickle that we're in. And if we were writing on a clean slate, I would say claims for medical monitoring, at least as asserted by these plaintiffs in this case in Durfee, are not emotional distress claims, and they do not arise merely because the Durfee plaintiffs have been in the general vicinity of radionuclides or in an area in which those radionuclides were released. They arise from the actual, and once we got past the pleading stage, we would show this, the actual human ingestion of these radionuclides. I think you may remember from the first go-round in these appeals, radioiodine is one of the important ones. The radioiodine goes through the stacks at Hanford, travels downwind, lands on the ground. Cows consume the grass, the pasture grass. The radioiodine passes through their milk. Humans consume the milk. The radioiodine is in the milk. The iodine concentrates in the thyroid, and then it irradiates the thyroid and causes cell changes. And that's an actual biological process resulting from actual ingestion of the radionuclides. And if you were writing on a clean slate, I would say to you that falls comfortably within the ambit of bodily injury, sickness, disease, or death, and that there is no double recovery because there's a distinct legal harm. There is a cost associated with the prudent monitoring of these plaintiffs for the onset of disease, and the people who brought the need to do that monitoring about should, in reason, bear that cost, even if no disease ever eventuates. That's the thinking behind the tort of medical monitoring. So I think that's pretty much what I have to say about this. It is a bit of a conundrum we're in, but we think there has to be one of two results. A remand if there's no subject matter jurisdiction to state court, or if there is subject matter jurisdiction, we think it follows that the claims aren't preempted to. In which case, back to the district court we should go, and the next step, I guess, would be a motion to dismiss for failure to state a claim under Washington law. Unless there are further questions about Durfee, I will talk briefly, now turning to the trials and the personal injury claims, about the causation test, and in particular about the district court's failure to give the requested instruction on what we believe is the governing causation test under Washington law, the substantial factor test. I don't know how much I really have to add to the briefing here, but I want to emphasize that this court's function, of course, is to predict how the Washington courts would rule on this issue, and causation, of course, is at the heart of this whole controversy. Has substantial factor been used or approved in the Washington court system in cases other than multiple defendants or multiple potential causes? Well, I would say yes. There's a discussion in the Lockwood decision from the Supreme Court, for example, that talks about the appropriate kind of causal analysis to use. That was an asbestos case. But it said that an analysis of the causal factors that the trier of fact should be presented with and be entitled to consider other causal influences, such as cigarette smoking, so that the causal influences implied wouldn't just be the asbestos. I haven't read Lockwood in a while. Didn't it involve different defendants who were responsible at different periods of time for asbestos? Among the asbestos defendants, inter se, it did. But I guess I'm suggesting that the analysis in Lockwood also says that causal influences not associated with any defendant before the court should be considered in the balance. In the Mavrudis decision, an intermediate appellate decision, the court, that was never an asbestos case, but one of the decisions cited in that case was, I think I'll get the name correct, Manguno. Not a Washington case, but it was cited with approval. And that case, too, involved asbestos and cigarette smoking. And the defendants in that case had taken pretty much the same position that the defendants are taking here, that the only function of the substantial factor test was to help out a plaintiff who couldn't tell one asbestos exposure apart from another. But if their own contributions to exposure taken collectively weren't enough, that should get them off the hook and the smoking shouldn't count. And the Manguno court rejected that argument, and that case was cited with approval in the Mavrudis. Now, obviously, toxic tort situations are often involving asbestos, so you get a lot of asbestos cases. But in addition, in the Dogger decision, not a toxic tort case, to be candid. That was a legal malpractice case, so it wasn't even a multiple cause situation. But it did contain an extended discussion from the Washington Supreme Court of the settings in which the substantial factor test would be appropriate. And one such setting in the court's view was, again, one presented by this case, where a similar but not identical result might have been reached without the defendant's conduct. In general, in toxic tort cases, in some sense, this is the sensible analysis, because there's a long latency period that processes occurring in the human body that are not accessible to sensory inspection. You don't have eyewitness testimony about what caused these diseases. You have to go back after the fact and analyze it in a world where you can't conduct an experiment any longer, because the causes have now converged on one human body. And the trial, in fact, has to assess whether one of the toxic tort seizures exposures played a substantial role in causing the injury. So, in a way, you're always talking about multiple causes in this kind of case. And certainly we were at trial. That's right. And therefore, isn't it generally true that the substantial factor test analysis is used when there are two different defendants before the court that have each contributed? Otherwise, every toxic tort case becomes you reduce the threshold of proof. And I'm not sure that the law supports that. Nothing in the Washington authorities, Your Honor, limits the test to that situation. And the language in the Washington... No, I understand that. But has it ever, I'm just asking whether it's ever been applied in Washington or in any other substantial numbers of jurisdictions to a situation where you have only one defendant who is alleged to have been the cause of a condition and you had various environmental or genetic or other factors that could possibly... I cannot stand here and cite your cases, Your Honor, focusing as we have on the law of Washington. I believe the answer would be yes, but I want to point out here that we have two defendants. So... Well... Well, that's a non-trivial fact. It's as though you had two asbestos defendants. And then under the analysis of Lockwood and the other Supreme Court decisions in Washington, the question would be how did not only what was their individual respective contribution to the asbestos exposure, but also how that asbestos exposure related to other causal influences. So actually, I think this fact pattern fits in pretty comfortably with those cases. You've told us about cases where the Washington courts say it's appropriate to use substantial factor. Any cases saying that but-for shouldn't be used? The Washington cases that are cited in the brief, Your Honor, are pretty clear that under Washington law, these are two mutually exclusive tests, that when the substantial factor test is applied, the but-for test is not. Okay. I think I've used up the time we've internally allotted, so I will sit down and hand off the podium to Mr. Haber. Thank you. May it please the Court, my name is Roy Haber, and I'm going to address some of the evidentiary issues that were decided by the district court, and they should be reviewed under the abuse of discretion standard. The district court indicated it had some confusion about this court's opinion in 2002. And the court stated, quote, let me explore that, referring to this court's previous opinion. You know I am not sure I understand totally the impact of it. And then went on and said, but clearly double dosing is not going to be required. So the court understood no double dosing, but I don't believe fully understood the scientific predicate for the decision to strike double dosing. The court stated below that if there is evidence of a dose that is over one but less than two, maybe that is admissible. But by itself not enough to prove causation. And went on and stated, quote, hypothetically if there is evidence that would suggest the exposure is 1.5, or would there be other evidence that would allow a reasonable scientist to conclude that the evidence all taken together would establish causation? And that was the right question. The problem is the judge answered it and said, I don't know the answer. But nevertheless, in the face of not knowing what evidence could be given to the jury, they struck the testimony of our experts that included all of the evidence, not just epidemiologic evidence, but the biological evidence. And we believe that maybe one of the reasons is the court did not continue analyzing this court's previous opinion, where you stated, quote, radiation is capable of causing a broad range of illnesses even at the lowest doses. This has been recognized by legal and scientific authority. You went on, common sense alone mitigates against establishing a bright line threshold. We do not believe, for example, that a person who has been exposed to 10 rem of radiation can get a neoplasm, but someone at 9.9 cannot. Despite this guidance, and despite the uncontradicted testimony of plaintiff's experts regarding the biological mechanisms that cause autoimmune disease as a result of radiation, the district court stated it would be speculative to suggest that radiation levels below the 40 rads can cause the diseases. Quote, the witness may not testify that he could see no reason to think there was no risk of hypothyroidism at below 40 rads. And finally, the witness may not testify that levels below 40 rads can cause hypothyroidism. Now that was a broad strike, a prohibitive ruling that prevented our experts from saying... Which witness, which ruling are you now? Can you give us a chapter and verse here? Yeah, Dr. Ruttenberg. The difficulty came, Dr. Ruttenberg had reviewed a study by Nagataki. And that study established that there was an increase in hypothyroidism, actually a doubling of the risk at 40 rads. Dr. Ruttenberg was asked at his examination whether or not he could say anything about that study at 100 rads. His response was, what's important here is that the study shows an increase at 40 rads. And that's all you can say about these data, referring to the data in that one study. Somehow Judge Nielsen at the prodding of the defendants took that to mean that no evidence of any kind below 40 rads would be permitted to go to a jury. And in fact, Judge Nielsen stated that the testimony suggesting that radiation exposure below 40 rads can cause hypothyroidism is based on insufficient reliable data. Now, what he was talking about was, even though Dr. Ruttenberg had testified under cross-examination at his deposition, when defense counsel asked, are there any studies that establish an increased risk at low doses? And he cited three studies, the Ito study, the Lloyd study, and the National Academy study, down at 1 rad, 10 rad. But somehow Judge Nielsen had it in his mind that unless you could come up with some dose below 40 rads, based on Nagasaki, that you didn't have causation. Dr. Ruttenberg, at his deposition, advised that it is, however, inappropriate to conclude that the risks do not extend below 10 to 20 rad, based on the biological mechanisms. And because Judge Nielsen only looked at epidemiologic data, when he referred to there being unreliable data, he was saying that 40 rads is the only data you can look at. You can't look at anything else. And he assigned an analytical gap to Dr. Ruttenberg, based upon his belief that you can't establish causation below 40 rads. What page are you... Ruttenberg's response is... The district court's ruling. I've got it here. I wasn't, I thought it was a more general... I'm sorry. I didn't hear you, Your Honor. Is he discussing... I just wondered the page and whether he was discussing... Let me see if I can find it here. It's at... On our brief, it's at page 33 of the reply brief. No, our opening brief. And it's at ER 1739. Okay. And his ruling on speculation is at ER 1739 at page 236, cited in our brief, our opening brief at pages 37 and 38. Now, what occurred here is that the analytical gap that occurred here was, as the Kennedy panel noted, quote, a gap of the district court's making because the district court did not rely on all of the data. Closing quotes, and that's cited in our brief at page 33. The analytical gap was the district court not considering all the data, only considering the epidemiologic data. The Ambrosini court said it this way. The district court, quote, failed to consider the entire record, relied heavily on isolated data. And that's what happened here. The district court did not rely at all on all of the uncontradicted biological testimony of our experts. There was no expert from the other side who disputed that, A, the cellular studies established that radiation down to one or two rads initiate the process that can result in the autoimmune disease. Number two, the gap in logic also is in not realizing that it makes no sense to have a 40 rad threshold. Last time I stood here, we talked about the doubling dose and pointed out you had two glasses, and they were filled up with different toxic substances or different insults or different genetic propensities. And here you had the picture. Judge McDonald said you have to prove that the entire picture that they were exposed to, even though that's not what it would take to cause the disease. And the same thing this time. The 40 rads is a doubling dose. And our experts were precluded from testifying that an absence of epidemiologic data does not rebut the biological testimony and biological data that establishes causation at low doses. The jury was not permitted to hear that information because the judge believed that the only data that mattered was mathematical data. And this court, I want to address one of the major gaps in the logic here. By adopting the but-for test, the court did not consider the following, and that is that Hashimoto's disease, the thyroid diseases, occur as a result of multiple factors that can be working together. You held last time around on this identical issue that when it gets to individual causation, individual factors, quote, might raise the likelihood of disease at lower doses. Now, when you have the but-for test, the judge was not able to consider that reality. Either radiation caused it or the stress or pregnancy with regard to Ms. Buckner caused it. He was not able to understand that the stress and pregnancy reduced the amount of radiation necessary, which is the scientific reason the substantial factor test should be adopted. Because when you don't adopt a substantial factor test, you are erecting a scientifically inaccurate construct. Because the reality is all the experts that testified said that the processes begin from one or two RADs. You don't need 40 RADs, and it's not logically real to say at 40 RADs they can get the dose, but at 39 nobody can get it, and that's essentially what happened here. Now, making matters worse, the court permitted the defendants to use Dr. Ruttenberg's deposition to cross-examine another expert. It was a hearsay deposition, and they were able to take the one sentence where Ruttenberg said, this is all you can say about the 40 RADs. But the court wouldn't let Ruttenberg testify that it's inappropriate to conclude, therefore, that you can't get the disease at 10 or 20 RADs. As Bob V. Modern Products Court noted, quote, cross-examination, which attempts to impeach by flipping hearsay evidence into the trial, will not be permitted, particularly in a case such as this, I'm still in the quote, where the cross-examiner had previously succeeded in keeping out closely related testimony. That's exactly what happened here. The defendants were able to keep out the explanatory, the explanation by Dr. Ruttenberg, that there's no reason why 40 RADs sets the limit. You have all this biological information. Nine judges from this court have looked at epidemiology in toxic tort cases. In the Kennedy panel, the Claussen panel, and this panel. And in each case, you have held that epidemiology is not the sine qua non of causation. In Kennedy, the panel said you don't need epidemiology to prove causation. And certainly, even if you have it, it does not set the bottom line threshold below which you can't get the disease. As this court noted, it makes no logical sense to do that. But that's what happened here. The jury was not permitted to hear any other information. And then, at closing argument, counsel goes to the jury and says, if you have Ruttenberg saying 40 RADs, which is not what Ruttenberg said. Ruttenberg testified that Nagataki had 40 RADs, but he had also testified that there's an increase down to 10 RADs. Did you get an objection in on that argument? During the argument? I don't. I can't say that there was an objection to the argument. I certainly objected to the reference to Dr. Ruttenberg during the cross of Davies, right? Yes, absolutely. And I have a follow-up question. Go ahead. Once the district court said, no, I'm going to allow them to do that, did you ask to put before the jury the explanatory information on 40 RADs? The judge ruled. Can I get a yes or no to start? I would say yes. We asked the court to permit that testimony, and the court said no. After they had used it in cross? Oh, no, before. The court struck the testimony. Let me reframe my question. Court strikes the testimony. The court struck the testimony. Ruttenberg does not go on at all, as I understand it, right? Correct. Davies is on the stand. He's being cross-examined by the defendants. They start to ask him about Ruttenberg's comments on 40 RADs. You object. Yes, there was an objection. The district court overrules the objection and allows the cross-examination. Correct. My question is, at that point, did you say, Your Honor, they've reopened the door, and they're putting on half of it. Can we bring in now, back in, the Ruttenberg testimony? Did you do that? I don't believe you'll find that in the record. So the answer is no? I believe so. Okay. But I don't think that that cures in any form. In other words, how many times did we ask? I wasn't asking if it cured or not. I was simply asking if you did. Right. Okay? Right. And I can say this much about it, that in the defendant's brief, they say, Why didn't we put Ruttenberg on the stand? Well, the judge already ruled he can't go on the stand. We would have been in contempt to do that. And I think that's what maybe motivated the trial team not to ask for it a second or a third time. So it's good when you had a question I was going to respond to. I was just concerned about there might be error in a trial sometimes, but there's also the question of prejudice. And apparently they did utilize this in the argument to the jury, but maybe you didn't object to that. Well, the objection had been overruled. And so defense counsel was free to use that information. And what that did is it establishes how clear the prejudice is. This jury, as all this jury heard, was you can't get the disease under 40 rads. They did not hear from Ruttenberg that that does not limit the testimony. It does not rebut. The basis for Ruttenberg's opinion that you can get it under 40 rads was what? He says it clearly. Based upon the understanding of the biological mechanisms, Dr. Hill had testified about the biological mechanisms. In the laboratory, if you take radiation, you hit these cells, they've established that chronic radiation, even down to one rad, will cause the initiation. What happens is when the cell gets hit, it either dies or injures. In either case, the body sees it now as a foreign body. And that occurs at the lowest doses. And that was evidence to that effect. Uncontradicted in the record. Defendants did not put on any expert to contradict Dr. Hill, who was the radiobiologist, who put all that evidence on. The other two brief issues are Dr. Davis. Let me just follow up because then why was Ruttenberg so critical if you had the other evidence? Well, he's the epidemiologist. He's the person who can testify. He's a medical doctor and an epidemiologist. He testifies that even though you have a doubling risk at 40 rads, if you have biological evidence, then 40 rads isn't the sine qua non for causation. And this court said it before. It's a threshold. And it discounts all of the biological evidence. It's simply saying that if you don't have the statistics, then you can't make out your case. And let me point out what the panel said last time around. Judge McDonald also believes that this case could only be made out by having statistics. And you held last time, when you talked, last time around, we also presented an enormous amount of testimony about non-statistical evidence. And this case had been in front of Judge McDonald, a doubling of the risk. Again, statistical evidence. And you held then, quote, by accepting defendant's argument that Plaintiff's case could be established only by epidemiologic evidence, the court discounted Plaintiff's scientific evidence of generic causation. And all of the biological testimony is about that. It is the capacity of the iodine to cause the disease. And Judge Nielsen did not permit Rutenberg or Davies. They both wrote about this. Didn't permit them to testify because in his mind, the only thing he could look at was statistical epidemiologic studies. And it was an abuse of discretion not to consider all the biological evidence. Thank you, Peter. All right. I'm sorry. Thank you. Good afternoon, Your Honors. My name is Daniel Johnson. I'm here on behalf of Shannon Rhodes. And I'll address the so-called juror misconduct issue from Ms. Rhodes' second trial. My colleague, David Breskin, trial counsel, will address the other evidentiary issues in Ms. Rhodes' second trial. And to save time, I'd like to start by asking whether there's any questions from the panel about the extrinsic evidence issue, the so-called juror misconduct issue. Well, the district court, I take it, has said that this was not necessarily, this was not misconduct because the juror could have found this, concluded this on the basis of what went on in this trial. That's right. And what standard do we review that? Well, it is a question that involves facts. But this court has said that it conducts a very independent review of whether extrinsic evidence, prejudicial extrinsic evidence was considered and reviews the entire record and that it's a mixed question of law and fact. Now, the first, there's really two issues here. And one of them, the issue you raised, it does involve facts. But I would submit that this court's in just as good a position to review it as the trial court because there was no hearing and because it involves an issue where the juror here states that during deliberations after the first vote, another juror said, this plaintiff tried her claims before and lost. Another juror said, yeah, I read it too. The defendant scoured the record and found some instances in which prior litigation involving Hanford was referenced. Those were listed in the judge's order. And those are the references from which the judge determined. Was there something out there, a piece of paper or something that they could have gotten this information from improperly? No. There's nothing in the trial record in which either of those two facts were stated and certainly nothing in writing. Those two facts being that this plaintiff's claims had been tried and she lost. The references in the record concern prior litigation in general. What I was asking was, is there any indication that they got this from an outside source? Is there any other source that they would have been there that they could, like a newspaper or something that got into this? Yeah. There were press accounts about the trial during the trial and before, of course, because this second trial occurred in November of 2005 and the first trial was earlier that year. So there were press accounts locally in Spokane at both periods and probably in between. Now, in the record... Sure. So that was all taken care of in Bois D'Ire, I would suppose, as to what... Well, the Plaintiff's Counsel tried, right. It was part of the questionnaire and some follow-up questions. But nothing came out that anybody had read anything about this plaintiff's case. So I would submit that the Court is in just as good a position as the trial court to examine whether this is, in fact, extrinsic evidence or not and that the record is perfectly clear that it's not. That is, if you accept what the affidavit says and there's no suggestion that one should not, that it cannot be squared with the conclusion that the trial court reached because those facts are not in the record. Your client took the stand? Oh, yes. And was your client examined about prior testimony? I don't think that that was... No, I don't think there are... I could be wrong, and if so, I'm sure my opponent will raise it, but I don't think that's among any of the references to prior litigation. That is the plaintiff's own testimony. Okay. So... You would agree if there was cross-examination and your client was asked in a prior proceeding you testified to, X, Y, Z, that a reasonable juror could infer that there was a prior trial. Yes, but I also don't think that that is... That's not the predicate that we're complaining of. In other words, I mean, it was raised in Gwadir that there was a prior trial, and there was plenty of information in the inadvertent references throughout the trial that there had been a prior trial. It doesn't take a rocket scientist to figure out if there was a prior trial she lost. The cases are very clear that when you have specific information that was not presented in the trial court, that that is extrinsic and prejudicial. If you look at the cases, some of the cases the defendant cited, Hughes v. Borg, the case from this court, where a policeman's affidavit attached to the certificate of probable cause was accidentally allowed into the jury room. And it contains some facts that were also the subject of his testimony or some other witness's testimony. A clear-cut case of an actual, material, physical, extrinsic item finding its way in the jury room in an unauthorized fashion. Well, we know that this information came from something that the jurors read because that's what the jurors said. The jurors said, I read it too. I read about her prior trial as well. And there's nothing that the trial court relied upon that was in writing concerning any of this information about prior litigation. It's only from testimony. Nothing in the questionnaire? Right. Well, the questionnaire said, are you aware of any prior litigation about Hanford? But it didn't say anything about Ms. Rhodes, and it didn't say anything about a prior trial or the results of her prior trial. I wanted to call to this court's attention again also another case cited by defendants, Carl Quintero, the Southern District of California case, in which this very issue is discussed. And that is the defendants, the criminal defendants, were complaining that the jurors had heard about prior litigation concerning their co-defendants. And the court said all they heard about was prior litigation concerning the same subject matter. They didn't hear, as they did in this case, that specific co-defendants had been tried before and found guilty. And the court explained how that difference is crucial because in the cases where that specific information is disclosed to the jurors, it is prejudicial and extrinsic to the trial. It's classic prejudicial information that we don't allow in to the jury. It undermines the very purpose of having our second trial in this case to have allowed the verdict, the supposed verdict of the first trial, into the jury's deliberations. And the only other issue, Your Honors, on this particular question is the standard of prejudice that must be proven once one concludes that extrinsic information has been introduced. And it's well established that the court presumes prejudice. I thought you were saying that there should have been an evidentiary hearing. No. In this case, we don't contend that there should have been an evidentiary hearing unless the court disagrees with that this is the standard of law. That's right. But, and particularly now that it's been over a year since the jury deliberated, we would prefer that we not go back in that manner because the question, the only question we can ask... Do you want us to hold that there was outside information? Well, I think that's established on the face of the affidavit and there's nothing to the contrary. And then what the court must do is apply this presumption of prejudice, which, if not rebutted, requires a new trial. And the defendant's only argument contrary to that is not that they rebutted it, but that that's not really the standard. And they relied on this court's opinion in Hard v. Burlington Northern, which is the only case out there that suggests any different standard for civil cases. It did not cite any authority. It is contrary to this court's own authority in more recent cases. And it is apparently dicta because it did not actually apply that rule in that case. So we submit that the court should remand for another trial. I'll turn this over to my colleague for the remaining issues on this Rhodes appeal. Thank you. Please, Court. I'm David Breskin. I'm here for Shannon Rhodes in her second trial. My assignment is to talk about the evidentiary errors that we have claimed. In our opening brief, you find those at pages 26 through 42 in our reply. You can find those at pages 15 to 27. Potentially, there were five evidentiary errors that we were claiming of note. Before I get into that, I'd like to just make three points quickly with the court. This was a medical causation case. The court itself acknowledged that the key core and central issue in this case was medical causation. This was not a case where it involved epidemiological causation, scientific causation, or any other form of causation other than medical causation. Other tools might have been used to arrive at that medical judgment, but in the end of the day, the key witnesses in these cases were the medical doctors who appeared and testified. And each of the court's rulings that we take issue with went to the heart of attacking our experts' medical causation, bolstering their experts' medical causation, and supplanting the rule of substantive foundation for a medical causation opinion by allowing speculation and allowing impeachment evidence to go before the jury as though it were substantive evidence to supply medical causation that their own expert, Dr. Schneider, testified he could not come up with. So, the cumulative effect of the court's evidentiary rulings was deprived, misrose, of the central issue in the case, proving medical causation. And it did so for untenable reasons and for applying or misapplying the rule of law. I recognize that abuse of discretion is a difficult standard, but here the evidence and what occurred is very clear. I might stop here and ask if there are any specific questions before going on. All right. Let me go on to give examples of what specifically we are contending the court failed to do that was untenable or contrary to law. To start with, there was an exchange involving the defense expert witness, the only medical causation witness that the defense called, which was Dr. Schneider. He was impeached by prior case in which he had affirmatively found a causal connection between exposure to radiation and possible thyroid disease. The court, in front of the jury, stated that this was totally collateral for the issues involving misrose and causation. The court acknowledged it had erred in doing so. It stated it made a mistake in doing so. It instructed its clerks to draft an impuritive instruction. Then it refused to give that instruction on the grounds that this was like a baseball or football game in which two rungs could cancel each other out. No legal tenet supports that. Evidence Rule 105 expressly recognizes impuritive instructions, eliminating instructions the court refused to give one. So it left the impression with the jury that the medical physician that was there supporting the defense case was beyond reproach and that the jury should not consider the conflict between his testimony previously in the prior case and this case. The second thing the court did was it allowed evidence of other possible causes without any foundation whatsoever to prove these causes caused misrose condition. The Washington Supreme Court dealt with an identical situation in Washington Irrigation v. Sherman. It said general questions of an expert about the effect of a particular type of incident on a person in the plaintiff's condition are improper, are improper, absent evidence showing that the plaintiff's condition had in fact been affected. The court, in our case, allowed cross-examination of our expert on other possible causes and direct examination of the defense expert on these despite recognizing this rule of law and despite ordering defense counsel not to ask questions of their own expert about other possible causes without proof that they in fact caused the condition. And despite that instruction, counsel did exactly that. And when we asked for a curative instruction, the court refused to give it. Again, without any rationale this time. Without any rationale. The third issue is that he limited our expert, Dr. Hoffman, to give a non-scientifically sound opinion on the best estimate even though he repeatedly testified that was not scientifically sound. The court used improperly its sober gatekeeping function not to rule out Dr. Hoffman's opinion entirely if we found it scientifically unsound, but to modify it by the court's own scientific sense to planning the expert's sense. Again, without foundation, without a tenable basis in law for doing it. Either he had to exclude the testimony entirely because it was not scientifically sound or permit Dr. Hoffman to give his opinion in a scientifically sound way. He could not himself supplant that. Let me wrap up quickly. The two other things were he wouldn't allow us to withdraw Dr. Hoffman's opinion on PC evidence. That was a separate opinion. We should have been allowed to do it under the authority we cited in the Glendale case. The court refused to allow us to do it using that. It had been in the first trial, so even though we could have withdrawn it prior to the first trial, we weren't allowed in a new trial to choose what opinions of our experts to present. And finally, he allowed cross-examination of Dr. Chopra on this PC evidence despite the lack of foundation that it was used by any other expert in his field. In fact, their own expert, Dr. Schneider, did not use the same evidence. Thank you. And please, the court. There's a number of ways I could proceed this afternoon. First, going with our errors, or I could also respond to their errors. My inclination would be to raise our affirmative points that we're raising in our appeals, unless the court would like me to do otherwise, that's what I would propose to do. Okay, great. In a series of pretrial rulings, the district court stripped the defendants of three key legal defenses. First, the court took the government contractor defense off the table, holding that the defense does not apply to claims under the Price-Anderson Act as a matter of law. Second, the court took the issue of faults off the table, holding that defendants were subject to strict liability under Washington law as incorporated into the Price-Anderson Act. And third, the court took the statute of limitations off the table, holding that plaintiffs who filed individual actions while a putative class action was pending were entitled to rely on the American Pipe Tolling Doctrine that protects absent class members after a class certification motion is denied. The district court erred on all three scores. But notwithstanding these threshold legal errors, the court granted defendants summary judgments on the six bellwether cases that they had selected, and defendants then prevailed at trial on four of the six bellwether cases that plaintiffs selected. Plaintiffs haven't appealed the judgments dismissing the claims of defendants' bellwether cases. Instead, these appeals involve the six bellwether cases selected by plaintiffs. So, again, I'd like to begin by addressing the issues that we've raised in the two cases where they prevailed at trial and then address the errors that they raised in the other four. With respect to the government contractor defense, the first point, the district court, it's really important to understand the nature there, he didn't go into the factors applying that defense and say, well, you didn't meet the specific criteria for the defense. He ruled as a threshold matter that the defense was categorically inapplicable under the Price-Anderson Act. Now, just taking a step back at the outset, that holding that the defense does not apply here as a matter of law is quite odd because this case is really what the doctrine is all about. DuPont reluctantly agreed at the height of World War II to operate the Hanford facility for the government for just one dollar, and the contract specified that DuPont didn't have any expertise in this and would have to follow the specifications set forth by the government. Perhaps most telling is the fact that after the Second World War was over, in the early years of the Cold War, and the contractor sought to extend the cooling times for the uranium, which would have reduced the emissions of I-131, the government said, you have no authority to do this. The contractors here did nothing other than what they were supposed to do. The challenge decisions in this case are the government's decisions. Would you talk a little bit about indemnification? Absolutely, Your Honor, and that really is critical because I think the district court essentially said, look, I understand that the government contract defense is generally the law of the land, but I find that it conflicts with the indemnification provisions of the Price-Anderson Act. What's wrong with that? Well, it's wrong for two reasons, Your Honor. First, the Price-Anderson Act is not a government contractor statute. That broadly indemnifies everybody who is a nuclear operator, only a very small portion of whom would be government contractors. Are you arguing that Price-Anderson doesn't indemnify an operator like Detente? No, but what I'm saying is that somehow this doesn't kind of render the indemnification provisions superfluous to have a government contractor defense because the Price-Anderson Act applies a lot more broadly than just government contractors, and of course not every government contractor even is going to have a government contractor defense. But even at a more fundamental level, I think this is really the key point, Your Honor. The indemnification does not extend the liability. In other words, the government contractor defense protects the government's discretionary decision-making. This Court has made that point. The Supreme Court emphasized that point in the Boyle case when it said that the analytical foundation for this is to protect the government's discretionary decision-making. There is no question, and this is really kind of the premise for the argument, that they could not have brought the suit against the government directly. So the question is, when the government decides to operate the Hanford facility by asking contractors to do it rather than by doing it themselves, does that somehow change this? And the point is, the decisions that are at issue are the government's decisions, regardless of whether they are implemented by the government or by a contractor. The reasons for the decision... I'm sorry, Your Honor. Would you explain what the Price-Anderson Act then was supposed to do? What does it apply to? The Price-Anderson Act is essentially like an insurance policy. In other words, it doesn't change the rules of liability. It basically says, listen, we know that doing nuclear work is very dangerous work, to be an operator of a nuclear facility. People wouldn't want to go into this thing, which is in their overall national interest, unless they had some kind of a backstop. So it basically requires utilities, other people who are operators, to get certain levels of insurance, and then it provides identification as a backstop. But the identification... The government is willing, is standing in the background to foot the bill in those situations. But doesn't that apply in full force to the situation where the government asks a contractor to do this? No, Your Honor, because that doesn't change the rules of liability. The government is willing to indemnify... It doesn't mean that the government is thereby lowering the threshold for what it is to make somebody liable in the first instance. That's the key analytical insight. What's your best case for the proposition you're arguing? Well, Your Honor, again... The government contractor defense still applies in a Price-Anderson situation? Well, it has been applied. In fact, the district courts, I think the Lamb case applied it. In other words, this is the first case that I'm aware of where the court actually says, as a matter of law, this is categorically inapplicable here. In other words, again, the issue here isn't... I didn't ask you whether this was the first case. What's your best case for the proposition that notwithstanding the indemnification provisions of Price-Anderson, the government contractor defense is still available to a client? I believe it's called the Lamb case that applied it. But again, I don't know that anybody has ever actually raised the argument before that it is categorically inapplicable in light of... I mean, I think people argue, gee, you don't need the government contractor defense. I don't think anybody has said you don't even get to the Boyle steps. Maybe they're saying you don't need it. Well, but again, the question is... Let's just take a step back. The general way that you go about analyzing these federal common law issues is... The court made this very clear in the Texas case. Federal common law is generally applicable unless Congress speaks directly to the issue. So the question is, is the indemnification provisions of the Price-Anderson Act, is that enough to speak directly? I mean, that is some kind of an implication. In our sense... Well, the Act talks in terms of... It defines certain terms, nuclear incidents or whatever. Sure. And it talks about indemnification. It doesn't have any limiting language. It says it doesn't apply to government contractors. No, of course not. In fact, and this is very interesting, Section 2210b-7 specifically eliminates a government contractor defense in the situation of underground nuclear detonations. So the government... Congress knows full well how to say that the government contractor defense does not apply when it didn't want to. It didn't say that was generally true under the Act. There's a specific provision of the Act in the section regarding indemnification of government contractors that specifically says a government contractor may not assert any defense based on the governmental nature of the work in a situation for underground detonations. Now, that provision is superfluous and nonsensical, really. If, as a threshold matter, the Price-Anderson Act, the government contractor defense did not apply at all under the Act. Again, if Congress wanted to say this, it could have said it. It knows how to say this. This would be a fairly significant step. And to say that Congress took this step by mere implication, by providing indemnification... Again, indemnification is not only to government contractors. It's to all nuclear operators. You're basically saying that indemnification is a waiver of the government's sovereign immunity. How can you be a nuclear operator and not a government contractor? Oh, most are not, Your Honor. Most are, you know, the... Governmental employees? No, Your Honor. Most are utilities. Most operators of... Most are utilities. In other words, the Three Mile Islands of the world, those are not government contractors. In the specific issue... This is, again, the point. The Price of Interest Act is a much broader act than an act about nuclear weapons facilities for the government. It really governs the nuclear industry generally. And, of course, you know, typically the people who build those big nuclear reactors are the utilities who use it to produce energy. And those are the people who, you know, that's... Again, that's most of the situations where this is coming up. And so I think it's kind of the sense that the district we're, I think, bought into that somehow the indemnification provisions are basically coextensive with the government contractors. So it wouldn't kind of make sense to kind of have a government contractor defense, but then why are you providing indemnification? But they don't link up like that at all. Again, both because the Price-Anderson Act goes far beyond government contractors and not every government contractor. It's a narrow defense. I mean, we don't contend that, you know, this is a huge, broad-sweeping defense. There are very specific conditions that Boyle sets forth to get the defense. Our concern is we never had our day in court to try and make a case that we meet those conditions. And, again, the district court said, well, the Price-Anderson Act is comprehensive. It is certainly procedurally comprehensive in the sense that it creates an exclusive federal cause of action and creates federal jurisdiction to bring all these things into federal court. But it's not substantively comprehensive in the sense that it doesn't set forth substantive grounds for liability and defenses as a general matter. It does include specific examples like the one I gave about 2210d7, but generally it looks to state law. So you can't basically say it's substantively comprehensive. That would be the kind of argument if it listed 18 specific defenses and didn't include government contractors, then you might say by negative implication there's a comprehensive, articulated, substantive scheme. That's not what we have here. So I guess turning then to the point that applies in spades, that the specific decisions that they are challenging here really are the government's decisions in wartime. The government made the decisions about how long these slugs should have been cooled before they were taken out. If the cooling time were lengthened, you wouldn't have this problem because this I-131 has a very short half-life. So if you cooled this longer, then it would have decayed. But of course the government was forced to balance two very real competing concerns, as the government often is. There was a war raging and they wanted that plutonium production come up to speed as quickly as possible. They had to balance that against the health and safety risks that were understood at the time, which were... And they wanted to encourage private entities to go into this. Absolutely. Well, that was, in the private sanctuary, that's an important part of what was going on then in the later stage. But again, in terms of the specifics of this case and the wartime production, in this case it was the private decisions. Of course, you wouldn't generally have the government contractor defense for utilities. The kind of people I think that you were just referring to, Chief Judge Schroeder, in the sense that the government isn't telling the people at Three Mile Island, you know, you must do this and that. The government contractor defense really would apply in a very limited situation. And again, you're protecting, going back to the purpose of the doctrine as explained in Boyle, it's protecting the government's discretionary decision-making. So just saying that, well, why do the contractors really care? You know, they turn around and they're indemnified. But, of course, that misses the point that the government contractor defense does not protect them. It protects the government. Moving on, if I could, just to the second issue on the issue of strict liability. The district court took that, took the issue of fault off the table by holding that defendants were strictly liable. As we explained in our brief, we think that's wrong as a matter of federal law under the Price-Anderson Act and state law. I'd like to focus here on the federal law component of that. The district court essentially followed the district court decision in Cook, which rejected the decisions of four other circuits, which have held that you cannot impose liability under the Price-Anderson Act for federally authorized emissions. And so basically to affirm the district court on that ground would be to create a lopsided circuit split. The plaintiffs here don't really push that point very hard. They just kind of refer to Cook and say it's better reason than the four other circuit decisions. But then they come up and say, well, and you also don't have any federally authorized emissions here. The district court, in its response to our motion for reconsideration, backed off of that assertion because certainly to decide that requires a lot of factual development of exactly what orders were given and what the status was for approvals. And that was not something that the district court was entitled to decide on summary judgment. So we think that the strict liability issue as well should not have been resolved at the summary judgment stage. Finally, I'd like to just touch very briefly on the statute of limits. Your interpretation of the incorporation and the reference to state law in the statute is that it relates only to what? It incorporates state law as otherwise limited by otherwise applicable federal law. But the provision 2014 double H that the district court seized on to basically say, and this is what the district court in the Cook case had done as well, those courts said, well, it here says we incorporate state law except to the extent inconsistent with section 2010, 2210, the other provision, the substantive provision of the Price-Anderson Act. And that means basically that's the only body of federal law that applies. And anything else, including safety standards, any other source of federal law, is not, does not apply. That's not a reasonable construction of that language with all respect, Your Honor, in the sense that what that is basically doing is saying we expressly preempt state law to the extent it's inconsistent with the Price-Anderson Act. But that doesn't by negative implication mean that any other state law that conflicts with other federal law is also preempted. I can understand the position that specific federal statutes that relate to safety standards and the like are not to be swept aside in deference to state law. Right. But we don't have that here. What we have is the actual standard under state law for judging this particular act, the whole activity of nuclear reactors. And I just guess I don't see why that would necessarily, why we would have to, under your theory, refer to the entire federal common law. Well, Your Honor, it seems to me that there's two levels of analysis. The first is if you take the district court's interpretation of 2014HH, what the district court said is the only federal law that trumps state law for purposes of incorporation to the Price-Anderson Act is the federal law set forth in the Price-Anderson Act, so that federal safety regulations governing nuclear safety, and I think Your Honor said you're willing to cross, you're willing, and then it seems to me that the next question is, well, where is the federal law that you claim, that we're claiming is preemptive? And the other side comes up and is saying, well, you don't have, you, unlike the other four circuits, don't have. No, but you are saying all, the entire federal common law is what we're reserving here as opposed to state law, and that's pretty broad. Well, Your Honor, there's no question that federal common law, like, just to go back to the government contractor defense for a sec, is federal law that has the binding force of law. In fact, in the Boyle case itself, it was the, that, the federal government contractor defense preempted inconsistent state law. There was a lawsuit against the helicopter manufacturer, and our point here is that their assertion on the other side, Your Honor, is that you need a statute or a regulation to have the, to have preemptive force. That is not true as a general matter of law, that the only federal law, that the only federal directives that can have preemptive effect must come from Congress. I mean, there are different sources of federal power. You have, Congress has, can exercise federal power, but the President can also exercise federal power legitimately. To the extent that the President, in the Manhattan Project, is delegating his constitutional power to somebody to do something, state law cannot interfere with that, cannot thwart that legitimate exercise of federal power. In other words, the Garamendi case is a good example where an executive agreement can preempt state law. It gets, it gets complicated, Your Honor, and I think our point is, certainly, these kind of complicated legal issues, whether or not the specific federal commands or approvals are of the type that could have preemptive effect, that, in a sense, that needs some further factual development on terms of what were the actual commands. And this report really blew by that in terms of imposing strict liability. If I could just briefly touch on the issue of extensive limitations, this applies only to Plaintiff Wise in this case because she, as opposed to Plaintiff Stanton, only Plaintiff Wise adds between Stanton and Wise, the two who prevailed at trial. It also applies to some of the other ones. But she did not file within three years of being diagnosed, so she would be time barred under Washington law. There's no question it's a three-year statute of limitations, but for some sort of tolling. The district court here says she was entitled to American-type tolling. The problem, which, you know, there's no question, there is a doctrine that says, if you were an absent class member, you get tolling for the period while the class is pending because you don't have to run out and file another lawsuit. You're entitled to rely on the pendency of class certification. The wrinkle here is that she actually went, the lawsuit in which the district court gave her American-type tolling was her individual lawsuit while the class certification was still pending. So she cannot, in any sense, claim to have been relying on the pendency of the class certification motion when she actually filed her own individual action. Well, we did move for summary judgment. We did not make this specific argument because we were, in fact, making a logically antecedent argument. The argument that we were making was that the American-type tolling was cut off in 1994 when the district court, we believe, for all intents and purposes, denied class certification. The district court, in this go-around, rejected that interpretation. It said, no, he left enough wiggle room there that you can't really say that he denied it outright. He said he was open to reconsideration. So it wasn't until the time that the plaintiffs withdrew their motion for class certification nine years later in 2003 that American-type tolling ended. So they actually get American-type tolling for almost 13 years under the district court scenario. The district court then not only denied our motion for summary judgment, but granted the plaintiff's summary judgment on sex limitations, specifically saying they get American-type tolling until it was withdrawn. So, in our view, that essentially ended the matter, and there really wasn't an opportunity for us to kind of say, wait a second, we have this alternative argument that even if we were wrong about the effect of the 94 ruling, people who filed after 94 shouldn't be able to invoke American-type tolling. This has been addressed by two circuits, and both of them have agreed with the legal position that we're advocating. We understand that there's a waiver issue here in the sense we did not make this specific argument. So Your Honor's question is absolutely a very fair one. I guess the one thing we'd say in the context of this particular case, I mean, it's a purely legal issue, and the whole nature of the Bellwether process was done, the whole mechanism of the Bellwether process was done, really, in order to bring some legal, some clarity to the legal parameters so people could start to understand how we could move to resolving the 1,800 claims that are out there. That's why the district court picked these. So it seems to us, at least, what we respectfully submit is that this is not a case where it would make sense to really be real sticklers on a waiver issue because, again, the whole point of the Bellwether process is to figure out what are the relative strengths and weaknesses of the claims to allow the parties to better assess them. So, again, in these particular circumstances, we would ask the court, understanding you have discretion to decide these purely legal issues, even though the specific argument wasn't raised below to address this specific argument. Two quick questions on that. Sure. Any circuit other than the Sixth who's addressed the issue of pre-certification individual filing, depriving American pipe tolling? The Sixth and the First. There's the Glater case and the Weiser Price case, as I recall. Glater in your brief? Glater, G-L-A-T-E-R, is the First Circuit case. I believe that was about 1983. And then I have a Sixth Circuit case, Weiser Pratt, W-Y-S-E-R dash Pratt, P-R-A-T-T. If the district court's ruling were upheld with respect to Weiss, is it conceivable that there would be other potential class plaintiffs whose claims would be time barred and hers wouldn't? Absolutely, Your Honor. In other words, there are many other among the plaintiffs who filed individual lawsuits more than three years after they were diagnosed, so they would need American pipe tolling. And so, again, it would give guidance to allow the parties to assess the relative strength or weakness of those other claims. So, yes, and it would potentially create an anomaly in terms of the result there. If there are no further questions on the issues that we raised, I'd like to move on to address the issues the other side raised, and then hopefully I'll save enough time to still be able to come back to have some rebuttal on these affirmative issues. Just very, very quickly on the Durfee case that Mr. Nordberg started with. Effectively, they are asking you to overrule the Byrd case. This is the medical monitoring claims. And they posit essentially what Mr. Nordberg called a pickle or a conundrum, that basically they say there's two options. Either there's no federal jurisdiction or there is federal jurisdiction and there is a claim. But there's obviously a third category where there's federal jurisdiction, but there's no substantive claim. In other words, it is a logical flaw to think that the absence of a cause of action can divest the court of jurisdiction. That's the Bell v. Hood case. And in fact, he says, well, you have the same statutory language. But you could have a situation, and in fact this is what the statute says. The statute brings all claims, whether they're meritorious or unmeritorious, involving a nuclear incident. That's one that causes injury to somebody, personal injury to somebody. It doesn't have to cause personal injury to you. As long as it causes personal injury to somebody, we want to bring all those claims together into federal court. It's a consolidation mechanism. Then, once you're in federal court, then you don't actually have a claim. But there's no logical inconsistency between the jurisdictional provision and the absence of a substantive cause of action. If there's no further questions on that, I'll just move on, because, again, we think that's a very straightforward application of this Court's ruling in Berg, where, after all, you did, notwithstanding your use of the word jurisdiction, you did affirm the dismissal on the merits of the medical monitoring claims. If it were really a jurisdictional problem, then, of course, that would not have been an appropriate disposition. In fact, their regime would lead to a very bizarre situation where you have concededly an exclusive federal cause of action that is assertable only in state court. So I think that that doesn't really require that much more comment. With respect to Buckner, and this is a very important issue where I think there's a lot of clarity can be added, the substantial factor, the causation issue, they suggest, I think they really set up something of a straw man in terms of what substantial factor is all about. And I think this goes to questions by both Chief Judge Schroeder and Judge Hawkins in terms of Washington law. There is no question that the general standard in tort law for factual causation is the Buckner standard. It's just really a matter of logic. You can't say that something factually caused your injury unless you can say that you wouldn't have been injured but for that event or that cause. Now, and I think this is really important because you heard some things that were inconsistent with this today. They are setting up a straw man to the extent that they're suggesting that our position is that you can have only one cause. You have to show that a single cause by itself is the but-for cause. That is not true. You can have a causal chain, every link in the chain of which is a but-for cause. In other words, you can have somebody who is weakened by heredity, let's say, and you can have then the radiation. You don't have to establish that the radiation alone is the but-for cause. The but-for cause, the but-for standard, in other words, works perfectly well in multiple cause cases. You just have to explain how every link in a chain is itself a but-for, is a necessary link. In other words, if you have a doctor who commits malpractice and leaves a plaintiff with a very soft skull and you have somebody else who hits the plaintiff on the head, even though hitting the plaintiff on the head wouldn't in and of itself be a but-for cause, there's no problem with establishing liability. Both the doctor and the person who hits the person on the head are considered to be but-for causes. And I think if there's anything I can do that would be helpful, it's really to commend to you Restatement 3rd of Torts, the proposed final draft of 2005, Sections 26 and 27, that have very extensive commentary on this point. And they really explain that multiple causes are in no way inconsistent with but-for causation. I think in your last opinion, in this very case, you recognized, you remanded to give the plaintiffs a chance, because this is what they said they'd been deprived of and they wanted, to make individualized showings. Last time it went off on the generic causation. You said, no, no, no, you can't decide a whole case based on generic causation. You need to have the individualized inquiry to which you say you're entitled. And you can attempt to show that your heredity plus radiation was the factual cause of your injury. But here what they're really trying to do is say, no, we want to say that anything that increases the risk should be considered to be a substantial factor. And therefore, we don't actually have to show how it links up with anything else in a chain to be a but-for cause. In other words, they really are positing substantial factor as a very fundamental departure from but-for. The restatement provisions, and the Washington case law, I think this is the point that you had raised, Judge Hawking, the Washington cases are entirely consistent with our view of the world, which is really the restatement's view, and it's just American tort law in general, that the substantial factor test was created in order to address really a logical conundrum, a very specific logical conundrum in the but-for world, which is when you have multiple but-for causes, so that you could say, well, it's the Summers versus Tice problem, when you have the person who's shot by two hunters, and you can't prove that either one is the but-for. In a sense, both of them are the but-for cause, and that doesn't allow both of them to get off the hook. And what the restatement does is explain substantial factor was, in a sense, an interlicitous term because it created a lot of questions. It's really a situation of multiple sufficient causes. In other words, and that ties in, I think, with your point, Chief Judge Schroeder, earlier, in terms of the cases in which this has been applied in Washington are cases where there's no question that asbestos company A and asbestos company B, their conduct is independently sufficient to cause the harm. What they're trying to do, though, what they're trying to take substantial factor in a very different way and say, oh, no, it doesn't have to be, we don't have to either show that it's part of a chain of causal links, all we have to do is show that it's something that increased our risk. That is a huge departure from general principles of American tort law, and they don't cite a single case to support that. The Manguno case they cite, which is a Louisiana law case from the Fifth Circuit, is entirely consistent with our view and the view that's set forth in the restatement. In other words, the restatement, third, clarifies and goes out of its way to say we are concerned that substantial factor has led to confusion. It hasn't, thankfully, in Washington because Washington has understood that the substantial factor test was really limited to a situation where there's an overdetermination of causes. You have multiple sufficient causes so that asbestos company A can't get off the hook with asbestos company B, or pesticide company A and pesticide company B. All the cases fit into that paradigm perfectly well. This is not something, you know, you would think if their view were really the law, they'd be able to cite you, to rattle off a whole bunch of cases that have said this. It's a very radical change. And again, two of the plaintiffs in this case actually won under the but-for test because they were, in this case, they were able to convince the jury that but for the exposure to radiation, they would not have been injured. So again, I just think the restatement really explains that. They take out of context, and their only response to this is to say, well, if you look at section 27, which they say is mistitled multiple sufficient causes, they say, well, there's this example of Abel, Baker, and Charlie who are leaning on a car. If you actually look at that example, that is simply multiple sufficient causal sex. That's recognizing that multiple sufficient causes don't have to be unitary, doesn't have to be the two hunters. It can be two causal chains, each of which is independently sufficient. But again, that is not what they're trying to do is to get away from the sufficiency. And one point that's really interesting is that if you compare pages 8 and 13 of their red brief in Buckner, they actually say the instruction that we requested on substantial factor is identical to the one that was requested in this Mavruta's case. But if you actually compare the two pages and flip, you'll see they took out a very critical passage from the Mavruta's instruction, which is to say that in Mavruta's it says, and any, if you find that two or more causes have combined to bring about an injury, and any one of them operating alone would have been sufficient to cause the injury, comma, each is considered. If you go back to page 8 of their brief, where they quote what they say is identical to Mavruta's, it just says, if you find that two or more causes have combined to be an injury, comma, each cause is considered to be, in other words, they took out the part about each is sufficient, which of course is the whole predicate for the operation of the substantial factor test. It's addressing a very specific logical problem in the but-for world, but it doesn't generally put you into a brave new world where substantial factor alone is enough to establish factual causation, which it's simply not. Going to some of the specific evidentiary errors, and again, I just would really urge you to look at the record. I think, Chief Judge Schroeder, you had actually asked Mr. Haber several times, where is the ruling that you're talking about? Mr. Haber stood here and said, the district court broadly struck everybody who wanted to talk about exposure below 40 rads. There is no such ruling. He was not able to give you a cite, their briefs don't give a cite, and in fact, that was what their case was about. They had people at trial, they had Davies and Hill testifying that you could have causation, you could have, that they believed that these injuries were caused at less than 40 rads. The only person who was precluded from testifying below 40 rads was Rutenberg, and that was not because the district court had some broad view that you needed epidemiological evidence below 40 rads. Again, he said that that was what the district court held. The district court held no such thing. You all made very clear in your last opinion in this case that you don't need epidemiological evidence in these kinds of cases. But what was the basis for the district court excluding Rutenberg? The basis is very clearly set forth in the testimony. He actually said in his deposition that he was not comfortable with the data in this case that would have allowed extrapolation. In other words, it was a very specific ruling based on Rutenberg's testimony. It wasn't any broad thing. If you look at it, the sentence that's really in question is on page 7 of Rutenberg's report. He had a sentence where he said, it is inappropriate, he said, well, okay, I understand most of the epidemiological studies don't show any risks below 40 rads. Then he had a sentence that said the following, it is inappropriate to conclude that the risks do not extend below these low-level doses. So he had kind of a double negative in that sentence where he said, well, you know, you can't, you know, it's unwritten, you can't say that you can't extrapolate below that. Well, he was asked that question in a positive sense. It definitely was, Dr. Rutenberg, do you believe that it's appropriate to extrapolate below 40 rads? He said, I do not feel comfortable with the data. I mean, he was trying to basically say something that was couched in a very coy way. Okay, so you were successful in keeping him out. On what basis could you use his deposition testimony to impeach? Well, because Davies, and this is absolutely... What made it admissible? That Davies had relied on his testimony. In other words, when Davies takes the stand, by the way, the only thing that Rutenberg was precluded from testifying about, he could have testified to anything. The district court did not... Well, in fact, he didn't testify. But that was by their choice. The only thing that he was precluded from testifying about was extrapolation below 40 rads. And again, that was not because of some overarching scientific theory that the district court imposed. It was because of Rutenberg's own reservations. But going to your point, Judge Hawkins, Davies cited Rutenberg's report. In other words, Davies himself relied on Rutenberg. Where Davies is relying on Rutenberg's data, it's entirely appropriate. Where is that? Where does he say that he's relying on? His report or what? Well, the Davies report cites the Rutenberg report. In other words, the Davies... In other words, where you have an expert on the stand who has relied on another expert, it's entirely appropriate to say... I understand that. Did he testify that he relied on it, or is that in his report? I believe it's both. I can double-check that when I sit down. But it's certainly in his report, because I have that here in my notes. And he also consulted with Rutenberg. In other words, this is not a situation where... Consultations, right. I'm looking at SER 81. It says here he's consulted with Dr. James Rutenberg. This is SER 81 in the Buckner pending. That's a consultation. I didn't... Right. Yeah, okay. The... Oh, then he also... Maybe I missed another one. Consultation. I've consulted Rutenberg from the University and... University of blank, it just says. And an epidemiologist with special experience in studies of exposure to ionizing radiation. I have also... So I said I have consulted with him, and I have reviewed expert reports on files that were submitted by Dr. Rutenberg. So, again, this doesn't... You know, first of all, it's really kind of not even clear whether or not... When you're cross-examining somebody, you're allowed to try and impeach them. And if they're... Certainly where they have relied, where they've consulted with another person and get their own conclusions seeming consistent with those other person's conclusions, that's kind of what cross-examination's about. To say, well, it's kind of funny that you are... You relied on his report, but, you know, you didn't really come out with any conclusion, did you? Did you? So... And in any event, you know, you can't possibly say... They haven't really even made a serious case that this is the basis for reversing a three-week jury trial. I mean, we don't think there's any error, but certainly Davies was still allowed to testify at length about his theory that low-level radiation can cause thyroid injury. And, again, you know, they certainly would have the burden of showing not only error, but that it really affected the fundamental fairness of the trial. And, again, so, you know, just to emphasize, the... Just so I'm clear about this... OK. You were successful in keeping away from the jury Ruttender's testimony about sub-40 rad exposure, right? Yes, Your Honor. But you were able to cross-examine Davies on that subject? We were able to... Yes or no? Yes, Your Honor. And, again, there's no inconsistency there because where Davies relied on Ruttender's testimony, whether admissible or inadmissible in and of itself, it's entirely appropriate to say, Well, gee, you... But you did more than that. You did more than that. Then you argued Ruttender in front of the jury. You rebbed from Ruttender in front of the jury. Again, they were not precluded from bringing in Ruttender at all to explain himself if he wanted to. But you did more than just asking about who he relied upon. After cross-examining, you then made a fairly big deal in front of the jury about what Ruttender had said, which you had previously excluded. Well, the reason we'd excluded it was because Ruttender himself said, I don't have the confidence in what I said there. In other words, Ruttender himself is the one who basically walked away from what he had said about less than 40 rads. I mean, the things we were cross-examining them with were really Ruttender's statements about, I don't feel comfortable. We were not cross-examining them with this statement. In other words, maybe we're confusing two different Ruttender statements. Ruttender had said in his report, he had this very coy sense, it is not unreasonable to do it. Then he affirmed it, and that was the part the district court kept out. That was the part we said, wait a second, this is too cheap by half to say you're not inconsistent. If he says, Your Honor, he says he's not comfortable with the data below 40 rads. That's the test. We didn't preclude him from keeping out the data that said he's not comfortable below 40 rads. That's the part that we then read to the jury. In other words, to the extent that, please don't, you know, it's not that the stuff that we kept out was stuff that we then brought in by no means. In other words, what we did is we said, the reason for keeping out that sentence is that that's inconsistent with what Ruttender, there's a long back and forth with the district court and Ruttender. Ruttender himself made clear that he really was not willing to vouch for any data at this low basis, which is why the district court said it. Then it's entirely appropriate. When Davies is relying on Ruttender for us to say, you know, well, it's kind of funny because Ruttender is not comfortable with all this stuff. So, again, you know, it's not the very statement that was kept out, just to clarify the record on that. Very quickly, in terms of the juror misconduct in Rhodes, I think Chief Justice Rutter, you really asked the key question at the outset, which is the standard of review issue. Clearly district courts have to have discretion in this kind of an area when people make allegations after the fact of extrinsic evidence. The district court in this case really took this very seriously. The district court brought in the parties and carefully went through the entire record. The district court, of course, is in the best position to understand what might have been extrinsic versus intrinsic based on the record. And the district court concluded, based on this careful examination, that it could have been extrinsic and there was nothing in the affidavit that contradicted that. He gave her the benefit of the doubt, the juror who wrote the affidavit. He gave her the benefit of the doubt. He said, I'm going to take that all at face value. But on its face, there was nothing in that affidavit that was inconsistent with the extrinsic. Do you want to talk at least briefly about the trial judge telling the jury during deliberations to disregard expert testimony that came in that you did not object to? Is this the hurdle cell issue in Peters? Yeah, the hurtling cells, the hurdle cells. I'm very glad you asked that, Your Honor, because this is really a situation where it's kind of amazing what they're arguing here. There is no dispute that the rules of the road in this case, that if it wasn't in the pretrial expert report, it's not coming in at trial, okay? And they've even reaffirmed that point. Didn't object. Well, Your Honor, but we, before trial, that that was the rules of the road in terms of, like, what you were supposed to do. They're basically saying, they said she's not going to go beyond her expert report. Then she starts talking about hurdle cells. We immediately started looking for references to hurdle cells because we said, like, we don't recall hurdle cells. The district court was certainly entitled... Putting aside the objection, we did object. I'll get there in a second. But the district court is certainly entitled to enforce the pretrial rules. District courts, according to the case law, generally in this circuit have substantial discretion, but that discretion starts to taper off once the evidence closes. And there are plenty of cases post-verdict that frown on this practice. Your Honor, again, it's different... The judge could have responded by saying you can give that whatever weight you want or consider it in light of all of the evidence, but what he told them was that they couldn't consider it at all. No, but, Your Honor, again, the key point is the... We did object as soon as they then went back to Peters. I mean, they're basically saying they were entitled to ambush us by violating his order, which they were fully cognizant of, and they insisted they would respect. And that basically the district judge was not entitled to punish them and to correct that violation of his order. In other words, this would be even different. I think the cases that they're citing involving... I think it's Rule 103. First of all, Rule 103 in its face is once the court makes a definitive ruling on the record, admitting or excluding evidence, either before or after trial, a party need not renew an objection. So this had all been clearly established before trial, that we were objecting to the extent that anything that was not in the expert report came in. We didn't even need to renew our objection. So they're omitting that part of it. But, again, this is not an error that we are raising on appeal. This is their attempting to say that the district court was not entitled to police them when they were trying to ambush us. They were basically saying, once we snuck it in, you just didn't nail us quickly enough for having basically flouted the district court's order. I mean, that is a shocking kind of result, that where there's no question... You don't hear them saying that, in fact, they were entitled to get into that hurdle cell testimony. There's no question that they were not. And all we were doing is, before we interrupted the flow of the trial, we'd assumed that they were acting in good faith. We said, well, let's make sure that, in fact, this wasn't in her report. So we're flipping back and forth. The next time that she started talking about hurdle cells, we immediately said, whoa, whoa, whoa. Hurdle cells? There was nothing about hurdle cells in this whole thing. And just one more step... Nothing to prevent you, when that was first inquired into, if you weren't certain, to ask on board hire if she had referred to that in her report, was there? Well, Your Honor, you know, I suppose... Again, we assumed, where they had just said that she wouldn't... You don't strike me as someone  Well, Your Honor, again, the point is, though, under the rules, we did not have to object at that point. We think we objected at the first reasonable opportunity, but frankly, having already made this clear before trial, in other words, there was no kind of invited error. The whole purpose of Rule 103 is to prevent the trial from taking place. Somebody doesn't object coming up on appeal and raising an evidentiary error that they never raised. This is not something that we are raising affirmatively as an evidentiary error. They're basically saying, because we didn't object, that the district court had no ability to enforce his own order. And in any event, one critical point is, on a kind of a prejudice, so far I've been discussing, I don't think there's any basis for saying there was an error, but even beyond that, they established no causal link between radiation and hurdle cells. In fact, DeGroote, in other words, even saying, the most Peters was going to say was that they were hurdle cells, but in the absence of anything saying, well, hurdle cells is an indication of radiation, that might have given the jury some framework in which to process hurdle cells. But there was nothing that would have allowed the jury to do anything with the hurdle cell testimony anyway, so any error that there might have been, which we don't think there was, would have been harmless. Very briefly, then, on some of the Rhodes evidentiary objections and whatever other ones, Your Honor, there's obviously limited time. No, you're off my list now. Excuse me? You're off my list now. You can go back to whatever you want. Okay, whatever, yeah, I mean, I guess, you know, the... You know what I'll do? I have nine and a half minutes. I will reserve the balance of my time if there's no further questions from the Court. Fine. Thank you, Your Honor. And the nine minutes and 28 seconds are remaining available to me, Your Honor. Let me start with that hurdle cell testimony. There was no objection on direct to the testimony about whether it was a marker of injury. The question was asked again on redirect, and there was no objection then either. That is not all defendants did. Far from merely refusing or failing to object during trial, they affirmatively invoked the testimony during closing argument. That's cited in our brief. Then, after the evidence had closed and the jury had begun deliberating, not having objected to these questions at any point during trial, they secured an instruction that the jury was to disregard the evidence that they themselves had invoked in closing. I don't think that a pretrial ruling to the general effect that witnesses should stick to their reports in any way preserved this point. And the defendants very well knew how to object because when it was even arguable that any testimony should be ventured one syllable beyond the report at trial because the trial record is littered with those objections time and time again. This is... So that's the hurdle cell. On substantial factor, there's been a lot of talk about what plaintiffs are trying to do and what would make sense and what wouldn't make sense. I don't know what plaintiffs are trying to do except to try these cases under rules of decision as prescribed by the Washington courts. And there's been some talk about how we took a sentence out of the jury instruction from Maroudis. We took that sentence out because the Maroudis court held that it was suspect. It held that under Huey, the plaintiff's evidence shouldn't be tested by whether the defendants' exposures were sufficient... would have been sufficient by themselves to cause the disease. So that's why we took it out. What we have in the case of Washington law is an unbroken line of authority in every toxic tort case to come before the Washington appellate court that's been cited to this court, every one that we know about, every decision decided under Washington law that we know about. An unbroken line of toxic tort authority applying the substantial factor test. No authority in any toxic tort case failing to apply it. That's because multiple causes are typical. Very briefly on Durfee. We've had a new concept of how to interpret Section 2210 today. The new interpretation that we just heard is that if the incident caused injury to someone, then any other claims involving that incident are permitted jurisdictionally under Price-Anderson. But again, that matches up with the same language that defines the scope of any preemption. So if that's so, then these plaintiff's claims were part of the nuclear incident that injured the other people, and the language wouldn't operate to preempt them. I think the truth of the matter is, at bottom, when we strip away all the jurisprudence that's been written about this, is that in 1988, Congress amended Price-Anderson with the idea of giving federal courts jurisdiction over claims at nuclear places that had to do with nuclear stuff that happened there. This is the language they chose, and their plan was not to use that language to define the substantive cause of action, but to refer people to state law to decide the actionability of the claims. I know the Court's not writing on a clean slate here, but I think if you cut through it, that's what's really true. There's certainly nothing in the legislative history that suggests that Congress even thought, one way or the other, about medical monitoring claims. I want to talk briefly about the contractor defense and the standards defense. Let me start with government regulatory standards. Before the 1988 amendments ever occurred, under Silkwood, as explained by the Court's opinion in Cook, which we've cited, I think everybody's general understanding was that state jury theories of liability imposing, you know, compensating victims of nuclear incidents after the fact were one thing. They might be in some tension with federal regulatory standards that prescribed the conduct of the operators before the fact, but that was a tension that the Supreme Court said in Silkwood we could and would live with. The courts that have decided that the federal regulatory regimes displace state law on the duty of care rely on the 1988 amendments. But those courts have it exactly wrong. What the 1988 amendments did, people want to treat Price-Anderson sometimes as though it's a carbon copy of the Rules of Decision Act, as though all it said were you will apply state rules of decision. But it goes further than the Rules of Decision Act. The Rules of Decision Act puts a period there, and the Price-Anderson goes on to say except where inconsistent with such section. That is to say, it defines the body of federal law that constitutes an exception to the referral to state law. If it hadn't done that, we might be facing a different situation, but it enumerates an exception, and the exception is not the Atomic Energy Act, the exception is not federal common law, the exception is not federally created doctrine generally. It is such section. And there's nothing in Section 2210 that supports either the use of regulatory standards to define the duty of care or the contractor defense. We don't need to reach the question, though, of the standard of care and whether or not that argument is available to defendants under the regulations after the amendments, because the defendants have never pointed to any federal law, any federal law governing emissions at the time of their releases. The Atomic Energy Act had not been enacted. The Administrative Procedure Act had not been enacted. We've never been pointed to a statute. We've never been pointed to a regulatory provision. We've never even been pointed to a governmental body that established these standards or any authority pursuant to which they were purportedly established. The defendants' own discovery responses characterize these tolerance doses that we're talking about as recommendations and guidelines and goals. So they do not remotely resemble a comprehensive federal regulatory regime or an occasion where there's a regulatory expertise to which it would be appropriate to defer. Completely different situation, and this Court can hold the plaintiffs' favor on that ground alone without reaching the broader question of whether the 88 amendments did or did not do something about the applicability of government regulatory emission standards. There are no such standards in this case. Defendants have pointed to no source of law for them. The contractor defense. Let's step back. In Boyle, the Court created judicial common law acting interstitially in an area where Congress had not spoken or had not addressed the issue because Congress had not enacted a statute governing contractor liability in cases of products liability claims involving defective helicopters. For 50 years or more in this country, Congress has unstintingly followed the policies of the Price-Anderson Act, the goals of which are to compensate nuclear incident victims through actions in tort against the contractors. So Congress contemplated and expressly provided by law for actions such as this one. There's no dispute, as you've said, that this section covers DOE contractors. There are sites around the country where actions arise under Price-Anderson against DOE operators all the time. This is far from a rare case. It covers contractors and utilities, too. I have 37 seconds to discuss the motion for summary judgment on the statute. It is not before this Court. No motion involving or mentioning plaintiffs' wives was made. No motion which, if granted, would have resulted in dismissal of her claims was made. There was no request for a jury instruction. The issue was not argued to the jury. It didn't show up in a JMOL. If the motion defendants did file had been granted, her claims would be timely because she filed within three years of the putative denial of class certification by Judge McDonald. This is a new motion they're filing on appeal. The Court should not hear it in the first instance here. It should be heard in the factual record in the Court below. Thank you. Thank you. Very briefly, Your Honors, with respect to the hurdle sales and the Peters testimony, I don't think you heard Mr. Norberg say that it was okay for her to have testified to this. In fact, I just went back into the record there. Volume 11 of the Buckner ER, and it says, Mr. Van Wert, sure they can. My understanding is that all she is supposed to be talking about is in that letter report. And then he says, well, you know, they just gave us the materials last night. This is pages 1995, 1996. This is when, right before she came up, up there. And so, of course, when she started talking about hurdle, we wanted to make sure that it wasn't in the stuff that was just given to us. But again, the understanding had been, and we made it clear that that was our understanding, she wouldn't go beyond the letter report. One other point I'd like to make quickly on substantial factor, they never, if you look at the proffered instruction, what is before this Court, of course, on substantial factor, is whether or not the Court erred, or the specific error that they're alleging is the failure to give their requested jury instruction on substantial factor. That instruction, if you'll read it, it talks about combined causes. Now, they never, in fact, argued that any causes combined. In other words, they never said, well, it's radiation plus heredity, or radiation plus some other vulnerability factor that's at play. So, to the contrary, their whole theory was kind of a differential diagnosis theory, where they were trying to rule out everything except radiation. In other words, they were not talking about radiation plus something else, but exactly the opposite. And so, if you look at the substantial factor instruction that they proposed, their own evidence didn't meet the test that they were proposing, which was about factors combining to create an injury. Just very quickly with respect to Durfee, Mr. Norberg got up here on rebuttal and said that this was a new interpretation of Section 2210 that we were advancing. But, of course, that interpretation is in our brief. They didn't file a reply brief, so it may be new in the sense that Mr. Norberg hasn't previously answered, but they certainly had the ability, which they waived by choosing not to file a reply brief in the Durfee case. And another point that's interesting in Durfee is they actually amended their complaint in Durfee to add a specific federal cause of action. So really, I don't even know how they can be arguing that they should have been remanded to state court where they added the federal cause of action. Mr. Norberg then just said, well, there's no federal law. They haven't been pointed to a statute or regulatory decision. Well, of course, we're talking here about things in the middle of the Second World War. Prior to the enactment of the APA, the creation of a regulatory state, there was no Atomic Energy Commission, no Nuclear Regulatory Commission. It can't be that the things that the day before those things were created, that once those are created, they would have preemptive effect. But the day before, when they're done by the Army Corps of Engineers, they don't have preemptive effect. I mean, that would be a very strange view of the world that the only source of preemption can be statutes or regulations. And, in fact, they say, well, our discovery responses conceded that the dose limits were not mandatory and binding. That is, of course, true. But this is really a semantic point, that the dose limits are not mandatory and binding on anybody in the sense that the dose limit defines the limit that a person could be exposed to safely. What is the safe dose for a person? That is not independently and legally binding on us. That's just a dose limit. The point is, standard operating procedures were created and approved by the Army Corps of Engineers that were emissions limits that were intended to reduce emissions to keep the emissions below the dose limit. So, in other words, and we make this very clear in that same answer. They really take the section about the dose limits out of context. Again, with respect to the government contractor defense, the Price-Anderson Act, there's just no necessary inconsistency between the Price-Anderson Act and its indemnification regime and the government contractor defense. Certainly nothing speaks directly to negate the federal common law government contractor defense and to the contrary, as I've said, there are specific provisions of the act that contemplate it and those would be really impossible to understand if it was categorically out the window. So what we would like the chance to do is the chance to have our day in court to try and prove that it's the government contractor defense. We're not certainly here before Your Honors today to say that on this record it's established as a matter of law because that raises some very important and tricky issues under Boyle. You have to meet some very specific standards. All we're saying is that you can't say that it's just categorically out the window. In terms of the strict liability point, the reference to the fact that there may be an express preemption provision in the Price-Anderson Act doesn't mean that you can't have conflict preemption generally. This is just a point the Supreme Court made in the Honda v. Geyer case and the Freightliner case that the inclusion of an express preemption provision doesn't take out the entire world of conflict preemption. I still have time, but I will not use up all my time. This has been a law I know I don't. Your Honors, I know I appreciate your attention today. Certainly if there's any other questions, but otherwise we're very grateful for all the time you've given us on this important case. Thank you. Thank you. The Court appreciates the comprehensiveness of the argument presented today. The matter's just... What? I told him not to ask, but he's going to ask. Oh, all right. I was going to ask whether or not the case is regarding Brentonburg. I think we've had enough. Thank you. The matters just argued are submitted for decision, and that concludes the Court's calendar for this session. The Court stands adjourned.
judges: Schroeder, Goodwin, Hawkins